The next case on the calendar is Levin, Hegna, et al. v. United States. Okay, and I see Ms. Smith that you're going to go first, and you reserve one minute for rebuttal. You can begin whenever you're ready. Yes. Thank you, Honor. Good morning. Suzelle Smith, representing the Levins, victims of Iranian state-sponsored terrorism. I'm aware that the Second Circuit is no stranger to the in re. 650 case, which is 15 years old, I think. I know at least some of you have authored opinions. Four. Thank you. I'm not sure we're supposed to call anyone by name. That's all right. It's okay. Yes, and Your Honor, a number of those at least reverse procedural irregularities committed by the district court, and here we are again with another procedural irregularity. I know I have a short period of time, and I really want to focus on what I think the panel needs to focus on most directly. This case, and I've handled a number of collection cases under TRIA for 9-11 victims and the Levins and others. In every other case that I have handled a TRIA collection matter, what the district court did was to bring all the claimants and the government and anyone in to the courtroom altogether and let everybody sort out first the liability, but also their relationships one to another in priority claims. This one was different, and I'm not re-arguing that. I was voted off the island, and I've been trying to swim back ever since, but the Levins have a separate claim, Levin v. Asa and Alavi, that is not part of the main action in Ray 650. Now, the district judge did let me, she gave me permission to come in to object to the forfeiture judgment in or on behalf of the government. So we had a different situation where I wasn't allowed to participate along the way to raise my objections, but I was allowed to come in at the end. The most important fact for this panel to consider in reviewing this case is that the Levins have an existing, presently, currently existing 1610C FSIA writ, which is attached to the assets which the district court is purporting to give to the government under the forfeiture action. That writ has never been dealt with. That writ has never been expunged or quashed or anything else. It is an existing writ that attaches to... When was that writ? That writ was issued, Your Honor, in 2016 before the judgment of 2017, which was entered on behalf of the other judgment creditors. The terminology can get a little bit confusing. The Kirshenbaum judgment creditors got a judgment in 2017. The Levins writ, 1610C writ, already existed. So whatever the judgment was that the judgment creditors got in 2017, and I've briefed all the things I think are a problem with that, but even if that judgment in 2017 is valid, our 1610C writ has never been expunged or dealt with. It is attached to those same assets. One of my questions was about how you have standing at this point. We've already determined that your clients have no claim. We've already said they have no claim back in 2016, so it didn't appear to me you have statutory standing based upon that. I think what you're suggesting to us is that the writ is creating the claim now? Did that happen after our determination? So two points, very important. What the Second Circuit held in the case that you're talking about, Your Honor. There were two cases, one where he said intervening was untimely and the claim was untimely. That's right. Weren't allowed to intervene, filed their own separate action. Tried to get into the forfeiture action as a claimant, and this panel said you can't come in under forfeiture. Not relitigating that, we can't ask for any of the money in the forfeiture, but we are entitled to go after the assets, the blocked assets under TRIA, which, by the way, the government didn't get a forfeiture first. The other Kirshenbaum judgment creditors got a judgment in 2017 subject to our You don't have a TRIA judgment. That's pending, right? Well, we have a judgment against Iran and a collection action, which is pertinent to, which is the process that you go through to get your  Which is pending. state law and under federal law that until the final resolution of all the claims, including the writ, which has to be dealt with, we have a preliminary levy to conserve property until the eventual execution. That's state law. That's federal law. You don't just get to ignore writs and say, oh, we have an existing writ. Guess what? We'll push the leavens off until their own action. They have a let on a writ on those assets, which we'll see what the government says in response to that. I understand. Thank you. All right. We'll hear from Mr. Dupont. Good morning, Your Honor. Ralph Dupont, and I'm pleased to be given the opportunity to appear from home. And I hope we're getting through to you OK. We can hear you fine. I just want to make two rather simple points here. My first problem is with the order that we have from Judge Prescott that we are parties to an agreement that our contention is we are not parties to because of our failure to furnish a second codicil to the agreement, which was worked out after careful and complete opportunity to debate, decide on what we would like to have in the agreement. And we asked for an agreement which completely covered percentages that are shared by each of these numerous plaintiffs. We did not get it. We still don't have it. And there is just simply no agreement that was ever entered into. Unfortunately, however, Judge Prescott, looking at the agreement, saw upon it my signature, the signatures of the rest of the folks, and it was a complete agreement in every respect. And why should she expect to have anything else? Well, she didn't because there was never a hearing. There was never an opportunity to bring these matters to her attention. There was a judgment that was handed down, I believe on May 17th, and that judgment just simply took it for granted that there was a bar to our proceeding further. And now we were part of the other judgment. I would respectfully ask the court's objection to that agreement because it's complete in every respect. We don't deny that, and that's the agreement we would like to see, except there is no second codicil. The second codicil would give us percentages for the Hegners and for the rest of the folks. And if those percentages were not in accordance with our instructions from our client, of course, we would never have released the agreement. Why is it signed, and why is it in the hands of anybody else? We have folks from San Francisco, I guess all the way up to the North Pole almost, in these proceedings. Mr. Dubont, this is Judge Wesley. Where in the agreement that appears at addendum one through five and bears your signature, or signature purporting to be yours, of September 29, 2017, where in the agreement is there a requirement of the second codicil? The agreement to the second codicil, Your Honor, was handled by the convenor, one of the attorneys in this matter, and he was responsible for getting together the mediation procedures and also collecting a signed document because the court wanted one as soon as possible, as I understood it, and the second codicil could not be worked out before there was disagreement among the remaining judgment creditors. I was assured that that was not going to be long to satisfy, and I left my document with the convener. I don't know how the document even reached Judge Forrest because I never released it from the field. Mr. Dubont, let me just ask you the same question I asked Ms. Smith. Similarly to her client, in 2016, we affirmed the dismissal of the forfeiture claims. So my question to you is, on what basis does your client have statutory standing at this point when we've already determined that their forfeiture claims were properly dismissed? I don't understand how the settlement agreement somehow—any issues regarding that—resurrects what we have determined was a proper dismissal of a forfeiture claim. I'm not sure that I completely understand the question, but I will say that we have a special situation here in that the headman had a defense to forfeiture which was pleaded. So they were forfeiture of claimants entitled to a trial by jury of the resolution of their issue. This does not get reached by the trial court. The trial court moots that by giving a judgment that favors all of the judgment creditors but attaches to it a requirement that nowhere appears that they're supposed to be sharing. That agreement was never reached, and of course if you think it has, then of course you would moot the claim that we made in our pleadings. And the jury trial, we never got. All right. All right. Thank you. We'll hear from the government. Mr. Raymond. Good morning, Your Honors, and may it please the Court. Speak right up, Counsel. Thank you. Good morning, Your Honors. May it please the Court. There you go. All right. Thank you. Samuel Raymond from the government. Your Honors, with respect, I'd like to begin with the Levins claim. The Levins are here for the third time before this Court. They are seeking a disproportionate windfall with respect to their judgment against the government of Iran. They're seeking 100 cents on the dollar, which is clear in their briefs. The other judgment creditors have agreed to a pro rata share of the forfeiture sum obtained in this case, which, as is clear in the settlement that is described in the settlement, will not be, not necessarily be, 100 cents. The Levins aren't part of the settlement because they were late to the dance. That's right, Your Honor. I don't mean to diminish that in any way. It was just an untimeliness situation. But their assertion is that they've perfected their rights as set forth in the judgment that they've obtained by filing a writ. And so, therefore, it's attached to anything that the Republic of Iran or its agencies or instrumentalities under the relevant statutes would have been available for seizure. What's your answer to that? Thank you, Your Honor. This court has rejected their standing to bring a forfeiture claim. It rejected Levin's ability to bring a forfeiture claim back in 2019 when it affirmed the district court for their lack of compliance with Supplemental Rule G. Okay. So it goes back to then, back from their ability to actually bring the forfeiture proceeding because of their failure to file the notices required by the statute. They made an argument under the TRIA that there was an exception, and that panel rejected that argument because we said that they sought to take it too far. Yes, Your Honor. All right. And I think that's right. It's the notwithstanding language that became the crux of their argument. Yes, Your Honor. This court was specifically – that issue was specifically briefed to this court, that the notwithstanding language preempted Supplemental Rule G, and the court denied that – or rejected that argument and held that Supplemental Rule G still bound the Levins in this forfeiture action. And so, Judge Bianco, your questions to both the Levins and to the Hednas, I think, are exactly right. This is a forfeiture claim. This is not some other action. The government moved to dismiss Assa's claim in the forfeiture, and this court has already held that the Levins and the Hednas do not have a claim in that forfeiture. To the extent they are arguing that the TRIA or some other set of laws allows them or provides statutory standing, there is simply no basis in this court's prior decisions. This court has claimed in, for example, combio exacto, that in order to have statutory standing in a forfeiture, the claimant must file a verified claim within the designated time period. Similar language in this court's decision in United States v. Technodyne, 753 F. 3rd. 368, that in order to claim an interest in seized property, not only must a litigant have some sort of interest, they also have to assert that interest in the property in the manner set forth in the supplemental rules. So there is no decision that the government is aware of where the court has allowed statutory standing other than with compliance with the supplemental rules. Not only did the Levins not comply with the supplemental rules, in fact, this court has already held that they didn't comply with the statutory, with the supplemental rules back in the 2019 decision. So by definition, the Levins do not have a claim in this action. They do not have statutory standing to oppose what the government requested of Judge Preska and which she granted, which was dismissal of Asa's claim. And they can't be heard now in this forfeiture action to be heard on any other set of rules. They are simply trying to relitigate the precise issues previously briefed before this court. And, Your Honors, with respect to the timeline and some of the questions, some of the issues raised by the Levins, I think they described that their wit was perfected before sometime in 2016. That was before then Judge Forrest was moving this case towards trial. And those issues could have been, some of those issues were, in a sense, raised by the Levins then. And one would have thought that if they thought they had a prior claim, they might have been there. That's right, Your Honor. And there's no basis, there's no legal basis that at this late stage, after the judgment in favor of the judgment creditors was affirmed by this court. I know they take exception to our determination at Kirschbaum, say that it was wrong, but weren't there to tell us that, I guess. Yes, Your Honor. And I think there's just no basis in the law that at this late stage, after the court has affirmed the judgment in favor of the judgment creditors, that a third party can come in with some separate set of law that they had the opportunity. And they're pretty plain about this. They could have brought some form of relief. You know, I went back through the docket. Judge Forrest offered them the chance to consolidate before the judgment creditor trial in 2017. They turned that down. They can't be heard at this late stage as the judgment creditors are finally seeking to enforce the judgment that this court already affirmed. How does the relation back doctrine play in here? It's rather unusual. I mean, does this then mean that once the government participates, that they get the benefit back to the time of the actual terrorist acts? Your Honor, I think, first of all, I don't think the court has to reach that issue. Okay. Because I think that it's pretty clear the Levins don't have standing. In order for this court to reach that issue, you'd first have to find that the Levins or the Haginas have standing. Then you'd have to say that ASA, again, the next step is that ASA, its rights were extinguished. That was the holding of the district court affirmed by this court in Kirshenbaum. You'd have to say that in some way you can vacate that judgment. Again, I know of no law that says that they can do that. Only then to reach the merits issue. All right. Your Honor, so I'm happy to answer any other questions. Happy to discuss the Haginas claim. What about the second codicil issue here? Your Honor, I think the first codicil is somewhat clear on its face. It says that the Haginas, who are parties, and I've heard Mr. DuPont. I don't think there's a debate or dispute that that's his signature on behalf of his clients. It says that after that, the Haginas can't take a position that is adverse to the United States in this litigation. And that's what they're doing right now. Their claim, putting aside the second codicil, the first- That clearly is contrary to the interests of the United States, which brokers a pro rata distribution of the proceeds of the ultimate sale and or distribution if this ever occurs. That's right, Your Honor. 650 and the other associated properties spread around. And any other sums accumulated during the management of the property over these now five or six years? That's right, Your Honor. This is adverse, undeniably adverse to the government's interest. Putting aside the second codicil, the first codicil is clear on its face that it can be enforced by the court, which is what Judge Prescott did in this case, holding that the Haginas are acting in a position adverse, the litigation adverse to the positions taken by the government here. All right, thank you, Mr. Raymond. Thank you very much.  Thank you, Your Honors. It's crucially important that the panel understand- Ms. Smith, forgive me. I have tinnitus, so yell at me. Yeah. As if you were scolding someone. Me too. So it's crucially important that the panel understand that we are not seeking a claim in forfeiture and that what this panel ruled or this court ruled on before had to do with forfeiture and not the Levin's TRIA claim. That claim is pending in the district court right now as a separate action. Our 1610C-2016-17 writ was attached to those assets, which are the in rim- In the 2019 decision, we determined that section 201's notwithstanding clause did not extend to allow the Levin's to seek a distribution of property seized by the government. So didn't we address the fact that there's no TRIA exceptions? So, Your Honor, what the court did then was say that the government, in a forfeiture action, TRIA doesn't prevent the government from going forward with a forfeiture action and excluding a claimant in forfeiture. This panel did not deal with a competing TRIA claim, which is- once you get the two actions pending and you get that issue resolved. This court did not resolve that, and this would be a terrible way to resolve that sort of by a back door if this court is going to hold that forfeiture supersedes TRIA. This is not the way to do it. That was not briefed in the district court. That was not an issue in the district court. That was forfeiture. Please, we're talking about TRIA and a TRIA- In the Smith case, we said we find no conflict between TRIA and a forfeiture law required. And you were dealing with the President of the United States, which TRIA specifically addresses in the statutory language of TRIA. Smith does not deal with a judgment creditor's right under TRIA to supersede the government's forfeiture actions. It does not. That would be- then it's a race to the courthouse by thousands of creditors, notwithstanding the fact that the government seeks to do the same, do something for all of those creditors. I mean, that's your problem here. A, you are late in getting on into the government situation. And B, you'd like to be number one. Well, you're no different than several thousand other people. Just to be fair, we always wanted to come in. And it's ironic, we begged the government to let us come in for a pro rata share. And the government said, you can't come in. Well, because you had timeliness problems. We had a timeliness problem. To be fair, Ms. Smith, you've been on this case a long time. I mean, your claim was untimely. In 2008. Yes, it was. Yes, in 2008. Okay. We didn't realize that the forfeiture action even existed. And so we missed the 60-day window. We did. But we were entitled to file a separate TRIA action, just like all the other judgment creditors did. And they followed it all the way through to judgment. The Kirshenbaum judgment creditors didn't just say, oh, we'll go along with the government. So you want us to hold that you can ignore all the timing requirements under the forfeiture laws by simply bringing a TRIA action? Is that what you're saying? No, the TRIA victims, the TRIA judgment creditors are always entitled to bring their own actions. They do not have to rely on the forfeiture. They don't. I understand that. They have a right to do that. And to be very candid, in many cases we've been more successful faster than the government, where 15 years later I've actually collected some of the money for the victims, my clients, for the victims of the terrorist acts. So, yes, it should be an overarching system. I agree with you, Your Honor. This race to the courthouse is unseemly. But I was forced to exercise our rights for the Leavens when I was cut out of forfeiture. I was forced to exercise our rights under TRIA to do our own action. And believe me, I've asked to be voted back on the island as often as yesterday. So it's a question of zero for the Leavens, nothing, or do you uphold their TRIA rights and send us back to the district court and say, you jumped too fast. You really need to sort out the priorities. And you know what sometimes happens then? Everybody comes together just like that settlement agreement with everybody else. Okay. Thank you, Your Honor. Thank you. Mr. Dupont, you have one minute. Thank you, Your Honor. I think one of the things that I would like to make absolutely clear, we have not on this record done anything else but to reach out for property that is not subject to forfeiture, that is un-forfeitable. These are the rents or interest in property which is flowing from the building. We understand the concept of an interest in property such as rents. This is income. That income is not tainted in any way. That is clean air and should be available to anyone who has a claim under TRIA or any other claim they may want to make to it. So basically to spend too much time on an agreement which has never been completed doesn't really do it for me. And we're working hard to get at assets of Iran, not to just simply impose some fines or things of that nature. We're working hard to get results for victims of terrorism. All right. Thank you, Mr. Dupont. Thank you to all sides for a reserved decision. Have a good day. Thank you, Your Honor. Thank you very much. The case being argued today is Sudroba and Saudi Company et al. versus Riyad Bazzi and Suad Bazzi. All right. I see we have Mr. Ford. You can begin whenever you're ready. You reserve two minutes for rebuttal. Thank you. Thank you, Your Honors. May it please the Court. I'm Adam Ford on behalf of Appellant SBR. Your Honors, this appeal I think really hinges upon one question, but it's a question that I think has profound implications for our country's immigration laws. The question that I think really decides this case is can an immigrant, a person attempting to obtain naturalized U.S. citizenship in our country, do so without any intent to stay here, without any intent to make America his or her home? And the district court, we think, committed error by finding that that was possible, and here's why we're requesting a reversal of that. First off, with respect to the immigration law, and I'm going to get into the statutory language in a moment, but I think the laws have to be read in context, right? Within sort of what are the policy goals? What are we trying to do with our immigration laws? Without getting on my soapbox, we're a nation of immigrants. But what type of immigrants? The type of immigrants that want to come here and make a better life for themselves, for their family, for their children, for their parents, want to positively contribute to our great nation, those are the types of immigrants that we are, and our laws, of course, are written to encourage those type of people to come here. And so now it's with that background that we look at the actual statutory language in terms of how one becomes a naturalized U.S. citizen, and that's found in 8 CFR 316.2 and 5. Subsection 2 sets forth the requirements for becoming a naturalized citizen. I think four or five of them deal with the residency requirement. You have to be a resident here. You have to reside here continuously for five years. You have to reside here. That's a mandatory feature, correct? Yeah, absolutely. You have to reside. You have to reside. And why does that amount to an intention to establish domicile? After all, somebody who is a Californian who's arrested in New York and spends years in a New York prison still has domicile in California, even though they're required to stay in New York. Why not apply the same principle here? I grant you there's an irony here. You want to be a U.S. citizen, you want to live someplace else, but that's a requirement that you be here. How can that requirement establish your intention? Well, because the easy answer is because Congress has said so, and Congress has said so. You could correct me. To be a permanent resident, you have to be here a certain amount of time, but I don't think there's a particular requirement that you say, I'm intending to stay after I'm a citizen or am I missing something? Respectfully, your honor. If you apply that, wouldn't there be some constitutional difficulties? Once someone becomes a citizen, they're not free to leave the country and or establish a domicile elsewhere? No, of course. So on day two, I become a United States citizen on September 1st, 2022. Can I move to Canada on September 2nd and establish a domicile there? You can. You can, but. So it's a question of intention. Isn't that the case? Just answer my question. Is it a question of intention? It is a question of intention after you've become a U.S. citizen. The day after when you decide. Don't fight the hypothetical, counsel. I'm not trying to. I'm trying to just answer. I became a United States citizen on September 2nd. I decided to move to Canada and live there and establish my domicile there. Can I do that? Under the law, you may. However, what Congress has said in subsection five, which is the definition, it's the definition of residence, right? And the way they define residence is they say, buy your domicile. Right. And I know there's a comment. I'm going to get to that. I'm going to get to that. I'll get to all of this. But Congress embedded in the actual statute, the requirement of residence, is your residence is your domicile, and your residence must be in the United States. Sure, but residence is a question of intention, as is domicile. Yes. Is it not? Residence is not a question of intention. Domicile is a question of intention. Well, I generally intend to reside in Geneseo, New York, and I'm domiciled there, too, because I'm in control of my life. But in any event, you still haven't addressed the question. If I decide to move and make my domicile elsewhere outside the United States, there's nothing that precludes me from doing that the day after I become a citizen. Yes, but what this case we're talking about the day of, right, because what we're saying, what the argument is, on the day that an immigrant becomes a naturalized U.S. citizen, Congress has determined that their domicile is in the United States. It must be. Let's start with facts here. They became citizens before this action was commenced. Is that the case? That's right, July 2018. And the action was commenced in September? Correct. So two months later? Yes. All right. They're capable of changing their domicile in two months, are they not? Absolutely. Okay. And the district court made findings that their intention was to have Lebanon be their domicile. The problem was that what the district court found was that they were never domiciled in New York, even on the day that they became citizens. Well, that might be a problem with their citizenship, but it's not a problem with their domicile, is it? Yeah, but it's a problem with everything, because if, while they were applying for citizenship. So a requirement for citizenship then becomes a cast-iron determination of domicile. That is what Congress has written in the statute. That's not my argument. Well, maybe we might disagree with you. So the question is, how far does that requirement reach? Is that it? That's what we have to decide, right? I'm not certain I understand that question. We have to decide whether you're right about what the implications of Congress's expression with regard to where someone has to reside at the time that they become a citizen. I would phrase it not as me, but I would phrase it as what the court has to decide is when Congress writes 8 CFR section 316.5. Congress, by the way, did not write 8 CFR. The executive department did. I apologize. That's right. It's the word of the executive for which we'll give some deference, because you don't have a citation to a statute. I don't have a citation to a statute. Because you've been talking about Congress, and now you mean the President. I apologize. That was my error. Let me ask you a question. There's a case that wasn't focused on by the District Court of the Parties, and I think it is important. In a case called Tagger, I don't know if you're familiar with it, in 2020, you had an Israeli citizen who was a permanent resident of the United States domiciled in New York. All right? So he's in New York, domiciled in New York, but he's a permanent resident alien. And what we said in that case was for purposes of diversity jurisdiction, a permanent resident is always an alien for diversity purposes. We conclude Tagger is an alien for purposes of diversity, even though he was domiciled in New York. So my understanding of that case that says that while the Bazzi's were permanent resident aliens, wherever they're staying, whatever their intent is, they're considered aliens for purposes of diversity jurisdiction. And the only relevant consideration in this case is in the period between the day they became citizens and the day of the filing of the lawsuit, where was their domicile during that period, right? Or am I missing something? Well, no, this is exactly the heart of the matter, which is that the district court judge should have presumed that they were domiciled in New York in July of 2019. And that would have- Why would there be a presumption of that? I don't understand that. I just told you that our case presumes otherwise. Our case law, this case presumes during your whole period of permanent resident alien, you are an alien of the foreign country. You're not, even if you're physically here. Right, and I think that, respectfully, I think that conflicts with the CFR code. I don't know what it conflicts with, but I'm telling you what the law is of the circuit. This is the law of the circuit, and it suggests that whatever the requirements are for immigration purposes are not the same for purposes of assessing diversity. That's what I think this case suggests, that it's two different things. Or am I missing something? Well, I- Clearly, what I just, the holding of that case is not looking at what the immigration requirements are. Well, in this case, and I'm blanking on the facts of the Taggart case, but certainly- An Israeli citizen who's living in New York, and we said, for diversity purposes, foreign citizens, for the purpose of diversity. I don't know why that wasn't focused on, but that's why I'm asking about it. I think it's an important case to bring up in the context of the year. I think so, too. The other case that wasn't actually brief, but I wanted to raise, is actually the Third Circuit case, which is sort of the inverse, which is El Gawi. And I can provide the, it's actually 170 Fed APX 231. And in that case, you actually, which is explicitly discussing 316.5 and how to interpret it. And what they say clear as day is that residents, when you're attempting to become a U.S. citizen, which I think might be the difference in the Taggart case if he was just a permanent resident, because if you're becoming a permanent resident, that's sort of different than when you, there's related, obviously, but you eventually become a citizen. And when you're dealing with, on the day of citizenship, what you have to affirm, you have to affirm that you've resided in the United States. Why can't you have more than one residence? I mean, the fortunate few among us have two, three, five residences scattered all over the world. Of course. And you can have as many residences as possible. So you can be a resident of New York and at the same time be a resident of Beirut and Bali and St. Tropez. Right, but the Supreme Court, since at least 1938, has said you can have many residences but only one domicile. And, right? That's correct. Right? So you can only have, and- So you don't have to be a resident for five years in the United States, but that doesn't mean that you can't have other residences, and at one of those residences, you may be maintaining your domicile. But this is where I'm going with the El Gawi case, which is they say, and again, going back to the Code of Federal Regulations, residence is defined as your domicile. So when you are attempting to become a naturalized U.S. citizen, the code, right, residence and domicile are the same. They're interchangeable. All right. We understand your argument. Thank you. Mr. Krieger. Thank you. Your Honor, it's Paul Krieger from Krieger, Kim, and Lewin for Appellees Suad and Riyad Bazzi. I represented them in front of the district court as well. So the question here is whether Judge Committee, the district court, made a factual legal error and whether his decision should be affirmed, of course,  Domicile, as Your Honors were getting at earlier, is about a question of intent, right? It's a factual inquiry that requires a district court to make factual findings and assess credibility. And here the district court heard testimony from six people, including five members of the Bazzi family, found them credible, explained there were no inconsistencies, and determined that the Bazzi's remained domiciled in Lebanon throughout the pendency of the litigation. And to overturn this determination, the court will have to find the district court committed to clear error. What Mr. Ford was just putting forth is a novel argument that has no support in the case law. It's unprecedented and unjustified for various reasons, despite the fact that determining domicile is an intent-focused inquiry and not one single factor outweighs any of the other, including the fact that the Bazzi's were residing in Brooklyn at the time that they applied for citizenship and the fact that they applied for citizenship. So a couple points on that regulation. First, as Judge Walker was pointing out, it's not a statute, it's a regulation. And the Department of Homeland Security can't control what qualifies as domicile for the purposes of subject matter jurisdiction by the courts, and that's been clear for decades. Second, that regulation clearly says it's for the purposes of this chapter, right? So the definition of domicile in that regulation is for the purposes of this chapter. It has nothing to do with subject matter jurisdiction that the courts regularly determine are multifactored tests. And one thing that didn't come up in Mr. Ford's argument earlier is that that regulation specifically says domicile is where you reside without regard to intent. And as the court knows, intent is the touchstone of the analysis of where someone's domiciled in the context of subject matter jurisdiction. And here, Judge Committee, after hearing, taking into account all the factors, found that the Bazis were domiciled in Lebanon, intended to return to Lebanon, even on the day they applied and received citizenship. So that regulation doesn't control here at all for a variety of reasons. One thing, just in terms of a piece of evidence that the district court did not address, in the opinion the district court said there's no need to consider the significance of two things, the sale of the Brooklyn apartment and the fact that they had purchased round-trip tickets to return to New York in October of 2019. Why should you not consider that? Isn't the fact that someone purchased a round-trip ticket potentially an indication that they intended to return to New York and be in New York and only changed their mind later after the lawsuit was filed? So why did the district court say I don't need to consider that? There might be explanations that other evidence might outweigh it, but I was a little confused by the idea that you wouldn't need to consider that. Well, I think what Judge Committee said was that the decision not to use their purchased plane ticket was not considered. I don't think he said he didn't consider the fact of the purchase of the ticket at all in his decision, and I would suggest, Your Honor, that the purchase of the ticket, if anything, corroborates the fact that the Basis always intended to return to Lebanon permanently after they got their citizenship. As the record was clear, the Basis purchased that ticket to return to Lebanon the day they received notice that they were going to have their citizenship hearing or swearing in. So that was two or three months before the complaint was filed. They then used that ticket to go to Lebanon, and they didn't return, right? They didn't use the return ticket, which was two months after they arrived in Lebanon. As the testimony from, I believe, Suad Basi made clear, they bought a round-trip ticket because they never testified or believed they were never going to return to New York. They said they were going to return to visit. Their daughters lived in the United States. So the fact that they purchased a round-trip ticket and they didn't use it, I think that the fact that they purchased that ticket, the fact that they returned, all those facts were considered by the court. The language that he says in the opinion is the decision not to use it, not to use it. In October 2019, after the complaint was filed, was not something that he said that he considered. I know, but he didn't credit their explanation for why they purchased it and then didn't use it. I understand what you're saying, but I would have expected that he would have said, with respect to the ticket, the purchase of the ticket, I credit their testimony that this was the reason and not some intent to remain in the United States. I think he did credit their testimony on that. Where did he do that? Well, he credited their testimony in basically every respect. I think what he's saying here is that he didn't evaluate their testimony about the decision not to use the ticket. The fact that they bought the round-trip ticket, why they bought the round-trip ticket, what it meant, I think he did credit. Where did he say I credit their testimony in every respect? I didn't see that either. Well, he didn't use the word in every respect. That's a fair point. But he certainly credited their testimony, and he found it corroborated. I don't know if you're familiar with this Taggart case because it wasn't focused on in the briefs, but I just want to make sure if we're articulating the law in this area that we're not looking at things that have already been decided by the court. So that case seems to suggest to me that if you're a permanent resident, during that period of time, wherever you are physically, you are considered for diversity purposes a foreign citizen. I don't know if you want to comment on that. Well, honestly, Your Honor, I haven't read the opinion. I haven't relied on it in our briefs, but it sounds right to me. The holding is consistent with our position. And I think it's also consistent with the idea that the fact that immigration definitions of domicile don't trump subject matter definitions of domicile. But if that's the holding of that case, then what we looked at here is during the period from citizenship to the filing of the complaint, what was their intent? And obviously you can look at what they did prior to that to inform your findings with respect to that period. And the district court covered the whole period, obviously. But all right. Well, if the court has no further questions, I'll rest on our briefs. Thank you, Your Honor. Thank you. Okay, Mr. Ford, you have two minutes. Thank you, Your Honor. Just a couple of quick points. In terms of the statement that our position is novel and finds no basis in the case law, I do think that there's been two divergent decisions at the district court level, specifically the seats case, which was in our briefs and discussed. And in that case, which was somewhat, well, I think almost identical to ours, Judge Patterson found that the statement, the sort of self-serving statements that someone never resided, they used the residing, not domicile language in that case, in the United States during the time that they were becoming citizens was inherently incredible because they had to have been here. They had to have been residing here, which is, again, defined as domiciled. Now, in the lower decision, a judge committee said, well, that case was different because the judge found the testimony of those individuals not credible. But where he found it was not credible was the exact point that judge- I thought there were other reasons he found it not credible besides simply the immigration issue. I didn't see that as the only reason. My recollection is that it was almost, I think it was exclusively focused on the statements of both the gentleman and I think his wife as well. And they tried to say neither of them had resided in the United States during this time period. And Judge Patterson said, well, that can't be possible because- and he said the same thing that Your Honor suggested earlier, which is, well, then there's a problem with the immigration application because that would be untruthful, which I think was the same argument here. But our- you know, the case law is very strong that district court judges are not supposed to overly credit self-serving testimony, particularly with individuals who have two or multiple homes because you can always get on a stand and say it was my intent to go somewhere else. And so there's not supposed to be this reliance on the self-serving testimony and instead on the evidence. And as Your Honor pointed out, the only evidence really at issue here was these round-trip plane tickets. No, no. I mean, the judge went through their taxes, their family ties. They owned a car in Lebanon. They reviewed their identification cards, insurance. I mean, it wasn't like there were just their statements. There was all this corroboration that was the basis for finding them credible. And you're saying, well, that should be out the window. We should just look at immigration definitions. Well, I mean, our real argument is that the determination should have been made that they were domiciled in New York in July of 2019. And that changes the entirety of the- Right, no matter what the evidence is or what their actual intent was. Even if the intent is overwhelming that they were returning to Lebanon, you're saying it doesn't matter. I think as a matter of law, and I know it's just, I understand it's the CFR, but the idea that naturalized, you know, people who want to become naturalized citizens here can come and we should encourage them to come and simply leave on the next day, simply so they have ease of travel is an anthem to our views. All right. Thank you. Thank you both for your decision. Thank you. Have a good day. Thank you. That completes the business of the court today. I ask that you adjourn the court. The court is adjourned. All right.